UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
UNITED STATES OF AMERICA           :
                                   :
     Plaintiff,                    :
                                   :          10-cr-94(JSR)
        -v-                        :
                                   :          OPINION AND ORDER
MAURICE PATTERSON                  :
                                   :
     Defendant.                    :
-----------------------------------x

JED S. RAKOFF, U.S.D.J.

Defendant Maurice Patterson stands accused of violating the
conditions of his supervised release by committing two state
crimes: falsely reporting an incident in the third degree, in
violation of New York State Penal Law § 240.50(4)(a); and
harassment in the second degree, in violation of New York State
Penal Law § 240.26. For the following reasons, the Court finds,
by a preponderance of the evidence, that the defendant has
violated his supervised release with respect to both
specifications, and the also Court denies his motion to dismiss
the harassment specification.

**Background**

Patterson began his term of supervised release in March
2019. On July 17, 2019, at the recommendation of the Probation
Office, this Court held a status conference with the defendant
to address Probation's concerns that he had failed to secure
employment, itself a condition of Patterson's supervised

1

release. At the conclusion of this hearing, the Court agreed to continue the matter for thirty days in order to allow the defendant an additional opportunity to find a job. See Transcript 11:7-25, ECF No. 236 (July 17, 2019).

The Court then held a second status conference on August 15, 2019, at which Probation reported that Patterson was still unemployed, though he had begun attending a job search program. The Court nevertheless agreed to an additional thirty-day continuance on the understanding that the defendant would exert every reasonable effort to secure employment. See Transcript 4:11-17, ECF No. 248 (Aug. 15, 2019).

Five days later, however, the defendant was arrested by local police on charges that he had harassed his daughter and her mother.[1] The arrest, which occurred on August 20, related back to an incident on June 3, 2019, when Patterson allegedly bit his daughter, Zareena Deveaux, on the face and also verbally threatened his daughter and her mother, Michelle Deveaux. Over the next several weeks, from June 3 until at least August 15, Patterson allegedly continued to harass Zareena and Michelle

---

[1] Shortly thereafter, this Court signed a warrant for Patterson's arrest on the charge that his alleged state crime also constituted a violation of his federal supervised release. Patterson appeared before this Court on August 29. The Court released him on bail, on the condition, among others, that he avoid the neighborhood where his daughter and her family reside. See Transcript 5:18-7:4, ECF No. 250 (Aug. 29, 2019).

Deveaux, both via text messages and in person. Further, on August 13, 2019, the defendant purportedly filed a knowingly false complaint with the New York City Administration for Children's Services (ACS) that accused Michelle Deveaux and her mother, Zareena Mohamed, of running an illegal daycare center out of their home and of selling Zareena Deveaux into prostitution.[2]

Based on these charges, the Probation Office issued an amended set of specifications against Patterson.[3] Specification 1 charges that the defendant violated his supervised release by committing the state crime of falsely reporting an incident in the third degree, in violation of New York State Penal Law § 240.50(4)(A). Specification 4 charges that the defendant further violated his supervised release by committing the state crime of harassment in the second degree, in violation of New York State Penal law § 240.26.

Additionally, Specification 3 charges that the defendant violated federal law by possessing 21.1 grams of marijuana, which substance Patterson's Probation Officer discovered during

---

[2] These factual allegations are summarized in a violation report submitted to the Court by the Probation Office on December 20, 2019.

[3] The specifications against Patterson were amended several times in ways not here relevant. The operative specifications in this proceeding are those issued on December 20, 2019.

a September 19, 2019 visit to the shelter where he resides. Specification 2, as noted above, charges that the defendant has failed to obtain employment.[4]

At an in-court hearing on February 21, 2020, the defendant admitted under oath to the marijuana specification (Specification 3), and the Government informed the Court that it would not proceed on the unemployment specification (Specification 2). The Government did proceed, however, on Specifications 1 and 4, the false reporting and harassment charges. Accordingly, on that same day, the court held an eight-hour evidentiary hearing on these specifications. Based on that hearing and on additional briefing provided by the parties, the Court makes the following findings of fact[5] and conclusions of law.

### Findings of Fact

---

[4] In addition to the four specifications noted above, Specifications 5 and 6 charged Patterson with participating in a December 13, 2019 mugging in Brooklyn, in violation of New York State Penal Law §§ 120 and 160.10. On January 21, 2020, the defendant appeared before this Court on an arrest warrant resulting from this purported incident. Following a hearing, the Court declined to detain Patterson on these charges, noting that the evidence against him was fairly weak. See Transcript 21:6-22:10; 23:16-24:12, ECF No. 257 (Jan. 21, 2019). In an email dated January 28, the Government informed the Court that it would not proceed on Specifications 5 and 6.

[5] The Court's findings of fact reflect its assessment of the credibility of each of the witnesses, including its observation of their demeanor.

Beginning with Specification 4, Probation alleges that the defendant committed harassment in the second degree, in violation of New York Penal Law § 240.26. This statute provides that "[a] person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person: 1. He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same; or . . . 3. He or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose."

The Government charges that Patterson harassed his daughter, Zareena Deveaux, and her mother, Michelle Deveaux, in an incident on June 3, 2019 and in a series of continuing interactions extending for approximately two-and-a-half months thereafter.

As to the June 3 incident, Zareena Deveaux, her mother Michelle Deveaux, and her grandmother Zareena Mohamed all testified to facts indicating, directly or indirectly, that Patterson bit Zareena Deveaux on the face and proceeded to make verbal threats against Michelle Deveaux. The younger Zareena's testimony, as well as text messages between her and the defendant, establish that around 6:25 PM on June 3, Patterson asked Zareena to leave the apartment that she occupied with her

mother and grandmother and come outside. Tr. 143:22-24;[6] GX
405C.[7] Although a slew of text messages indicate that Zareena had
a difficult and sometimes antagonistic relationship with her
father, who had only recently been released from prison, she
complied. See generally GX 405; Tr. 139:1-140:10. Both Michelle
Deveaux and Zareena Mohamed testified that the younger Zareena
did not have any unusual markings on her face when she went
outside to meet her father. Tr. 41:12-13; 225:2-9.

After meeting outside, Zareena Deveaux further testified,
Patterson hugged her tightly and bit her painfully on the face,
in a manner that was neither playful nor consensual. Id. 145:13-
24; 146:2-3. At that point, Zareena pulled away from Patterson,
and he threatened to "F [her] up." Id. 146:6-7. Zareena then
went back into the apartment, where she told her mother and
grandmother what had happened and showed them the mark on her
face resulting from the bite. Id. 147-6-10. Both Michelle
Deveaux and Zareena Mohamed corroborated this testimony by
noting that they, too, observed a visible, red mark on the
younger Zareena's face, albeit one that did not bleed or break
the skin. Id. 42:10-22; 226:6-11.

---

[6] "Tr." citations refer to the transcript of the February 21,
2020 evidentiary hearing, ECF No. 260.

[7] "GX" citations refer to the Government's exhibits that were
received into evidence at the February 21, 2020 hearing.

Hearing testimony further establishes that, after observing the bite mark, Michelle Deveaux and Zareena Mohamed went outside to confront Patterson, Id. 43:3-4; 226:12-13, and that Zareena Deveaux later followed, Id. 147:14-20. During this confrontation, according to all three women, Patterson threatened Michelle Deveaux that he was going to "lay [her] out" and that she was going to "taste grass." Id. 43:24-25; 148:10-18; 227:1-4. At 6:52 PM, Michelle Deveaux called 911 to report that "a guy named Mauricio Patterson, [who is] on probation . . . came in front of my building to see his daughter, and grabbed her." GX 303. By the time the police arrived, however, the Deveaux family declined to report the incident. Tr. 461:10; 148:23-34.[8]

Notwithstanding the initial decision of the Deveaux family not to report Patterson's biting of Zareena to the police, the evidence establishes that, thereafter, Patterson continued to harass Zareena and Michelle Deveaux over the course of the summer. Michelle Deveaux testified that on at least one occasion, Patterson encountered her walking along the street and

---

[8] Zareena Deveaux testified that the family declined to tell the police about the incident in the hope that Patterson would henceforth leave them alone, and because the defendant had pleaded with them not to report him. Tr. 149:1-8. Text messages from that evening between Zareena Deveaux and the defendant corroborate this. See GX 405D-405J. Michelle Deveaux testified, however, that her sister spoke to the police but did not report Patterson out of fear that he would retaliate. Tr. 46:4-10.

yelled out obscenities at her. Id. 47:19-48:3. The Government also introduced several text-message exchanges between Zareena Deveaux and Patterson from August 2019 in which the defendant makes derogatory and sexually-inappropriate comments to his daughter, and in which Zareena responds by telling Patterson to stop contacting her. See GX 401.

This evidence, taken together, presents a strong prima facie case that the defendant is guilty of the crime charged in Specification 4. The June 3 biting of Zareena Deveaux satisfies the "physical contact" element of paragraph 1 of the statute, and the defendant's ensuing threat to make Michelle Deveaux "taste grass" also satisfies the element of threatened physical contact of that same paragraph. Moreover, the defendant's verbal harassment of Michelle Deveaux and offensive text messages to his daughter over the subsequent months constitute a "course of conduct . . . which alarm[s] or seriously annoy[s] such other person[s] and which serve[s] no legitimate purpose." N.Y. Penal Law § 240.26(3). As to the mens rea element — that Patterson have acted "with intent to harass, annoy or alarm" the Deveaux family — the malicious and inappropriate nature of Patterson's actions, as well as the lack of alternative explanations for his behavior, are sufficient to make a prima facie case that this element is satisfied.

Patterson's primary defense to this charge is to impeach the credibility of Michelle Deveaux. To be sure, Ms. Deveaux exhibited a clear bias against the defendant, as well as a willingness to lie in order to conceal the fact that she and Patterson had previously been on better terms. For example, on cross-examination, Ms. Deveaux denied ever having made statements to Patterson's Probation Officer that the defendant was a good father who supported his daughter. Tr. 73:11-74:15. But the defendant's 2010 presentence investigation report includes statements from Ms. Deveaux to the Probation Officer that the defendant "was always a good father, that he always financially supported their daughter, . . . that he took her to and from school, . . . [and] that their daughter cries for him to return home [from prison]." DX 500.[9] While there is some indication that Ms. Deveaux may have misunderstood the here-relevant questions put to her at the hearing, believing defense counsel to be referring to Patterson's current Probation Officer, rather than the one who prepared the 2010 report, see Tr. 74:16-75:23, the more likely conclusion is that the witness's animosity towards the defendant led her to deny having previously had a more positive relationship with him. Similarly,

---

[9] "DX" citations refer to the defense's exhibits that were received into evidence during and after the February 21, 2020 hearing.

during cross-examination, Ms. Deveaux denied a more recent interaction in which she allowed the defendant to pick her up and kiss her on the lips, testimony which defense counsel impeached by producing a video showing just such an interaction. Compare Tr. 72:6-20 with DX 506.

These contradictions do somewhat undermine the credibility of Michelle Deveaux (as well as corroborating her "love/hate" relation with the defendant), but that is not a sufficient defense for Patterson. As to the June 3 incident, not only Michelle Deveaux but also Zareena Deveaux and Zareena Mohamed testified that the defendant bit his daughter and threatened her mother. See Tr. 42:10-16; 145:13-24; 226:3-11. The latter's testimony is particularly significant. Even if the Court were to completely discount Michelle Deveaux's testimony on the strength of the impeachment evidence against her, and even if the Court were to similarly discount Zareena Deveaux's testimony on the assumption that she also held a bias against the defendant (both of which decisions, in the Court's view, would be overreactions), Ms. Mohamed's credibility would remain unquestioned. Moreover, the contemporaneous text messages between Zareena Deveaux and the defendant cited above provide strong corroborating evidence for the Government's case against Patterson with respect to both the June 3 incident and the

continuing harassment of at least Zareena Deveaux through August.

The defense also offers some other arguments for discounting the Government's case. For example, neither Zareena nor Michelle Deveaux took a photo or video of the bite mark on Zareena's cheek, despite the fact that Zareena regularly posts "selfies" on social media. See Tr. 102:6-17. Further, when Michelle Deveaux called 911, her first words were not to say that there was a man who had threatened her or bitten her daughter, but simply that "there's a guy named Mauricio Patterson. He's on probation, officer." GX 303. Similarly, a lengthy text message from Zareena Deveaux to her father later in the evening on June 3, in which Zareena emphatically tells the defendant to leave her alone, mentions the biting incident but does not mention the threat to Michelle Deveaux. And although Zareena Deveaux did report to Patterson's Probation Officer that the defendant had verbally harassed her, neither she nor Michelle Deveaux reported the biting incident. Tr. 13:11-21; 27:18-28:16.

None of this evidence, however, actually contradicts the testimony of Zareena Deveaux, Michelle Deveaux, and Zareena Mohamed about their interactions with Patterson on June 3. At worst, this evidence merely omits some of the details that these women later included in their in-court testimony. But omissions

are not nearly as probative of lack of credibility as are inconsistencies. Moreover, much of this evidence, including the 911 call, arose in the heat of the moment, when Michelle Deveaux and her family were obviously not thinking in terms of planning a trial strategy against Patterson. Michelle and Zareena Deveaux's later conversations with the defendant's Probation Officer may also have been restrained by an understandable desire not to share sensitive and personal information with an outside party.

As an additional defense, Patterson elicited testimony from two Bronx Assistant District Attorneys (ADAs) who interviewed Zareena Deveaux in August and September of 2019 about the biting incident. Both testified that, while Zareena described the bite to them as "weird" and "unwanted," she also stated that she did not believe that her father intended to hurt her. Tr. 215:2-216:6; 220:11-18. While this description may have influenced the decision of these ADAs whether and how to charge Patterson for biting his daughter, see id. 218:11-21, it is no defense to the Specification at issue here. To have violated his supervised release with respect to Specification 4, Patterson need only have acted with the intent to "harass, annoy or alarm" his daughter, not to injure her. See N.Y. Penal Law § 240.26. The suggestion that Patterson did not intend to hurt his daughter,

while relevant to this Court's eventual sentencing decision, is not a defense to the charge itself.

Finding these and Patterson's remaining defenses unpersuasive, the Court therefore concludes by a preponderance of the evidence that Patterson has violated his supervised release with respect to Specification 4.

Turning to Specification 1, Probation charges Patterson with committing the state crime of falsely reporting an incident in the third degree, in violation of New York Penal Law § 240.50(4)(A). This statute provides that "[a] person is guilty of falsely reporting an incident in the third degree when, knowing the information reported, conveyed or circulated to be false or baseless, he or she: . . . 4. [r]eports, by word or action, an alleged occurrence or condition of child abuse or maltreatment or abuse or neglect of a vulnerable person which did not in fact occur or exist to: (a) the statewide central register of child abuse and maltreatment . . . ."

Here, the Government alleges that, on or about August 13, 2019, the defendant filed a knowingly false report with ACS, wrongly accusing Michelle Deveaux and Zareena Mohamed of selling the younger Zareena into prostitution and of operating an illegal daycare center at their home.

Based on testimony and documentary evidence, the Court finds that Paterson did indeed file a complaint against the

Deveaux family on August 13.[10] The intake report completed by an
ACS worker at 11:27 that evening reflects that Patterson told
the agency that he "suspects Zareena is prostituting because [he
had] seen her on the corner and three males picked her up." DX
208. He also reported that the family was running a daycare out
of their home. Id. The Court further finds that this report was
false. The testimony of Shavonne Howell, the ACS child
protective specialist who investigated Patterson's prostitution
complaint, established that this allegation had no basis. Tr.
256:6-18. Testimony from Amanda Alexander, a childcare
investigator at the city's Department of Health and Mental
Hygiene who investigated the daycare complaint, similarly
concluded that it was false. Id. 131:6-12.

Moreover, text messages between the defendant and Zareena
Deveaux, introduced into evidence by the Government, strongly
suggest that Patterson filed this complaint with the intent of
harassing Michelle Deveaux and Zareena Mohamed, apparently to
exact revenge for their eventual decision to report Patterson's
behavior to his Probation Officer. See id. 13:6-14; 14:8-15; GX

---

[10] The filing of this false report, in the Government's telling,
is what finally led Zareena and Michelle Deveaux and Zareena
Mohamed to file a police report against Patterson for all of the
events that had occurred since June 3. That, in turn, led to
Patterson's arrest by local police and the initiation of the
instant proceeding.

401K & M. On August 14, the day after filing his report, the defendant texted his daughter a picture of the entrance to the New York City Department of Social Services, followed by the statements that "[a] US marshal will serve ur [sic] mom and grandma" and that "child protection services will randomly pop up and investigate ur house hold [sic]." GX 401J. In another text message exchange with Zareena Deveaux, GX 401O, the defendant implied that he knew that Michelle Deveaux earned legitimate income from babysitting a few children that were part of her family, and that he sought to block this source of income by reporting that she ran an illegal daycare.

Intent to harass, however, is not an element of the state crime, though this evidence may nonetheless bear on Patterson's culpability. The applicable mens rea standard is instead that the defendant must have acted with the knowledge that the information he was reporting was false or baseless. N.Y. Penal Law § 240.50(4)(A).

With respect to the prostitution allegation, the Court concludes, though not without some difficulty, that the Government has not adequately proved the required mens rea. As a threshold matter, the text of Specification 1 makes clear that the operative "report" for the purposes of the violation of state law is the complaint that Patterson filed with ACS on the

evening of August 13, introduced into evidence as DX 208.[11] Thus,

although Patterson had several follow-up conversations with the

agency after his initial report, see, e.g., Tr. 240:20-241:1;

251:25-253:14, the Court looks to the initial complaint in

determining Patterson's guilt.[12] And the Court cannot conclude,

looking at the August 13 report, that Patterson accused Michelle

Deveaux and Zareena Mohamed of selling Zareena Deveaux into

prostitution knowing this was false. The August 13 report merely

states that Patterson "suspects" that Zareena Deveaux is engaged

in prostitution. DX 208. The defendant reported several grounds

to ACS for this suspicion, some of which the evidence in the

record (including Zareena Deveaux's social media posts) suggests

he may have actually believed his suspicion. DX 208; see, e.g.,

DX 100-17.

With respect to the daycare allegation, however, the Court

concludes by a preponderance of the evidence that Patterson is

guilty of the crime of falsely reporting an incident in the

---

[11] The Government contested this point in its summation, but the
charging instrument unambiguously refers to the "complaint"
filed "on or about August 13, 2019."

[12] In an August 15 follow-up conversation with Ms. Howell, the
defendant clearly did accuse Michelle Deveaux and Zareena
Mohamed of trafficking Zareena Deveaux. Tr. 252:15-21; GX 210.
This is relevant to the Court's overall understanding of the
situation, and perhaps as well to sentencing on the other
charge, but not to Patterson's guilt with respect to the initial
report.

third degree. Based on the testimony cited above, there is no dispute that Patterson filed a report of an illegal daycare with the relevant state agency and that this report was false. And there can be little doubt that Patterson knew this report to be baseless. Although Michelle Deveaux regularly babysat for a few relatives, both she and Zareena Mohamed testified that, on each occasion that Patterson was in their apartment, no children were present other than these relatives.[13] Tr. 36:16-23; 40:6-10; 229:17-21. Moreover, the text message exchanges between Patterson and Zareena Deveaux cited above clearly indicate that Patterson had an ulterior motive when reporting the illegal daycare, further suggesting that he knew the allegation to be false.

By way of a defense, Patterson argues, essentially, that he was induced or prompted into making this report because he was proactively asked by the ACS intake worker with whom he spoke on August 13 whether there was a daycare in the Deveaux home.

---

[13] The defense impeached this testimony by producing a photograph, taken by Zareena Deveaux, that shows a young child present in Michelle Deveaux's apartment on a day when Patterson was also there. DX 506. Confronted with this photo, Michelle Deveaux acknowledged that the child was not a relative, but rather the child of a neighbor, who was in the apartment for a playdate with Michelle Deveaux's younger daughter. Tr. 81:18-82:5. But this does not undermine the core of Deveaux's testimony above. There is no way that Patterson could have reasonably concluded from the presence of this single child that Michelle Deveaux was running a daycare.

Indeed, the defense is correct that such a question appears on a checklist that each ACS intake worker must ask of every complainant as a matter of course. DX 208. However, the mere fact that Patterson was asked such a question did not force him to provide an affirmative answer. (Indeed, he answered "no" to most of the other checklist questions that the intake worker asked him. Id.) Thus, although it may be relevant for sentencing, it does not bear on Patterson's substantive guilt that the checklist question may have planted the idea in his mind of filing a false report of an illegal daycare.

The Court accordingly finds that Patterson violated his supervised release with respect to the daycare allegation in Specification 1.

## Motion to Dismiss

Notwithstanding the Court's factual findings above, the defense moves to dismiss Specification 4 on the ground that the New York Penal Law defines second-degree harassment as a "violation," rather than a "crime."[14] N.Y. Penal Law § 240.26

---

[14] The distinction, under New York law, turns on the maximum sentence that a particular offense carries. A "violation" is an offense, other than a traffic infraction, that carries a maximum carceral sentence of fifteen days or fewer. N.Y. Penal Law § 10.00(3). A "crime," on the other hand, is an offense that carries a potential sentence of more than fifteen days in prison. Id. §§ 10.00(4)-(6). (This category is further divided into "misdemeanors," and "felonies," only the latter of which carry a maximum prison sentence of more than one year. Id.).

(emphasis added). <u>See also</u> <u>Penree v. City of Utica</u>, 694 Fed.
App'x 30, 34 (2d Cir. 2017) ("[U]nder New York law, . . .
second-degree harassment . . . is defined as a 'violation,'
which is not within the definition of a 'crime.'") (citations
omitted).

The pertinent condition of Patterson's supervised release
requires that he "not commit another Federal, State, or local
<u>crime</u>." 18 U.S.C. § 3583(d) (emphasis added). This motion
therefore raises the question of whether the federal supervised
release statute also requires defendants to refrain from acts
which states deem to be categorically less culpable than
"crimes," but still to merit some criminal-like sanctions. The
defense argues that it does not.

This appears to be a question of first impression, and one
with persuasive arguments on both sides. But to begin with, the
interpretation of the federal statute is clearly a matter of
federal law, not state law. The distinction between "crimes" and
"violations" under New York law is therefore not controlling.
And although section 3583(d) does not define the term "crime,"
other federal authorities provide clear guidance against
Patterson's position.

The Second Circuit most recently encountered an analogous
question in <u>Nowakowski v. New York</u>, 835 F.3d 210 (2d Cir. 2016).
That case also involved the question, albeit in a different

context, of whether the New York state "violation" of second-degree harassment is a "crime" for purposes of federal law. There, a defendant convicted of second-degree harassment had filed a habeas petition under 28 U.S.C. § 2254 but had finished serving his sentence during the pendency of his case. The question accordingly arose of whether the habeas petition was moot. Id. at 214-15. That question, in turn, hinged on whether the court applied the presumption from Spencer v. Kemna, 523 U.S. 1 (1998), that criminal convictions carry collateral consequences for purposes of mootness even after a sentence is served. 835 F.3d at 215.

Holding that this presumption did apply in the context of a New York state "violation," the Second Circuit noted, first, that Article III mootness is an issue of federal, not state, law, and that the question must therefore be analyzed "by reference to federal principles." Id. at 219. Rather than merely importing the state-law definition of a crime, the court instead applied essentially a functional approach, holding that whether a state-law offense is a crime for purposes of federal law depends on such factors as the purpose of the state statute setting forth the offense, the procedures through which a charge is brought, the type of punishment that attaches, and whether federal constitutional protections would apply to the accused. Id. 219-21. As to the New York second-degree harassment statute

in particular, the court noted that New York enforces this statute through its criminal jurisdiction, i.e., through an action brought by a prosecutor, and that the offense is punishable by incarceration. The court further noted that the statute resembles a criminal statute in that it requires scienter — the "intent to harass, annoy, or alarm another person" — and that the purpose of the statute is to punish and deter culpable conduct. Id. at 220-22. Accordingly, the Second Circuit concluded that the New York "violation" of second-degree harassment is a crime for purposes of federal mootness. Id. at 222.

Although the question in Nowakowski arose in a different context than that at issue here, its reasoning nonetheless applies to the definition of the term "crime" in section 3583(d) of Title 18. Because second-degree harassment is an offense defined in New York's penal law, enforced through its criminal procedures, and punishable by incarceration, this "violation" is a crime for the purposes of a supervised release violation.

There is, moreover, no evidence from the text or purpose of the supervised release statute that Congress intended an alternative meaning for the term "Federal, State, or local crime" here. By way of such evidence, the defendant cites the now-repealed parole statute, 18 U.S.C. § 4214, which used the broader term "any criminal offense" in an equivalent provision.

18 U.S.C. § 4214(b)(1) (repealed). The defendant further notes that in 1986, Congress amended the parole statute to replace the term "a Federal, State, or local crime" with "any criminal offense." Pub. L. No. 99-646, § 58(f), 100 Stat. 3592 (1986). This amendment, in the defense's view, was intended to clarify that a defendant could violate his parole by committing a state offense categorized as something lesser than a crime; that, in turn, would suggest that the use of the narrower term in the modern supervised release statute was intended to exclude such offenses from the scope of a violation.

But the legislative history of the 1986 amendment suggests otherwise. The House Report accompanying the bill explains, rather, that the addition of the broader term was intended "to include persons convicted of crimes by a foreign or Indian Tribal government." H.R. Rep. 99-797, at 29 (1986). Accordingly, the use of the narrower "Federal, State, or local crime" in the modern statute does not demonstrate Congressional intent to excuse defendants on supervised release who commit state-law "violations."

Additionally, it is not lost on the Court that reading the term "crime" in the supervised release statute to exclude New York "violations" could lead to strange results. First, the Second Circuit has affirmed at least two revocations of supervised release predicated on the defendant having committed

a New York state "violation." See United States v. Miller, 567

F. App'x 45 (2d Cir. 2014) (second-degree harassment); United

States v. Stevenson, 601 F. App'x 24 (2d Cir. 2015) (marijuana

possession). In neither of these cases did the court even

discuss the distinction between a "violation" and a "crime,"

likely because defense counsel did not raise it.[15] (Rather, both

defendants had appealed on sufficiency-of-evidence grounds.)

Nevertheless, holding in Patterson's favor here might upset

these long-ago-settled convictions, subjecting these and

innumerable other defendants to legal uncertainty.

Second, a broader examination of the New York state

offenses designated as "violations" reveals that many are, by

any reasonable definition, fairly serious crimes. In addition to

harassment in the second-degree, other New York "violations"

include, for example, unlawful possession of an air-gun (such as

a BB gun) on school grounds, see N.Y. Penal Law § 265.06, (a

potentially quite dangerous situation) as well as, e.g.,

criminal solicitation in the fifth degree, id. § 100.00. While

---

[15] In United States v. Chatelain, 360 F.3d 114 (2d Cir. 2004), a
defendant was charged with a New York state crime but pled
guilty to a lesser violation. The district judge revoked the
defendant's supervised release, finding that the Government had
established by a preponderance of the evidence that the
defendant had committed the greater crime, even though he had
not pled guilty to it. The Second Circuit affirmed on that
ground, without reaching the question of whether a state-law
violation is a crime for the purposes of supervised release. Id.
at 124-25.

not all such violations are so obviously serious, these examples demonstrate to the Court's satisfaction that Congress likely did not intend to categorically exclude these offenses from the definition of a supervised release violation.

The defendant's motion to dismiss Specification 4 is accordingly denied.

## Conclusion

For the foregoing reasons, the Court finds that defendant Maurice Patterson has violated his supervised release with respect to Specifications 1 and 4, as well as Specification 3 (which he already admitted). The parties are accordingly directed to appear for sentencing at 2:00 PM on May 15, 2020.

SO ORDERED

Dated:    New York, NY
           March 27, 2020

_____
United States District Judge